**THE GILLAM LAW FIRM**
*A Professional Law Corporation*
Carol L. Gillam (SBN 102354)
Sara Heum (SBN 288136)
10880 Wilshire Boulevard, Suite 1101
Los Angeles, California 90024
Telephone: (310) 203-9977
Facsimile: (310) 203-9922
carol@gillamlaw.com, sara@gillamlaw.com

Attorneys for Plaintiff Vinatha Kutagula

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINATHA KUTAGULA, an individual,<br><br>                         Plaintiff,<br><br>        vs.<br><br>MATTERPORT, INC., a corporation, and COSTAR GROUP, an entity,<br><br>                         Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>1. Whistleblower Retaliation in Violation of Sarbanes-Oxley Act<br>2. Retaliation in Violation of Labor Code § 1102.5<br>3. Discrimination in Violation of FEHA<br>4. Harassment in Violation of FEHA<br>5. Retaliation in Violation of FEHA<br>6. Failure to Take Reasonable Steps to Prevent in Violation of FEHA<br>7. Violation of California Family Rights Act<br>8. Wrongful Termination in Violation of Public Policy<br>9. Unfair Business Practices<br>10. Declaratory Relief<br><br>**JURY TRIAL DEMANDED** |

1

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

Plaintiff VINATHA KUTAGULA, demanding a jury trial, alleges, on information and belief, the following in support of her complaint.

## JURISDICTION AND VENUE

1.     This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.* ("SOX"). Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, as well as under 28 U.S.C. §§ 2201 and 2202. This suit is authorized and instituted pursuant to the above federal statutes. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by the Sarbanes-Oxley Act. This court has ancillary jurisdiction of the state law claims because they are sufficiently related to the federal claims.

2.     Venue is proper under 28 U.S.C. § 1391 because Defendant MATTERPORT, INC.'s principal place of business was in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

3.     Plaintiff VINATHA KUTAGULA (hereinafter "Ms. Kutagula" or "Plaintiff") resides in Santa Clara County, California. She is a 51-year-old woman of South Asian ancestry and origin. Plaintiff was hired by Defendant Matterport, Inc. ("MATTERPORT" or "the Company") in January 2021. Her role was to perform several critical senior roles for Matterport, including overseeing Sales Operations, Customer Success and Customer Support. Her role expanded in 2022 when she was tasked with overseeing Sales Enablement as well. In 2023, Matterport promoted Plaintiff to join the Matterport Executive Leadership Team. Ms. Kutagula performed her job competently at all relevant times.

4.     As the facts below will demonstrate, Plaintiff reasonably believed she uncovered numerous violations of federal and state law by Matterport,

appropriately went up the chain of command to notify the Company, and in all respects tried to get the Company into compliance. Instead of being thanked by Company management for her efforts to keep them out of legal peril, Plaintiff was harassed and fired for trying to do the right thing.

5.     At all material times to this action, Defendant Matterport, Inc. was a publicly traded company (NASDAQ symbol: MTTR) headquartered in Sunnyvale, California. On information and belief, Matterport's stock was delisted when it was acquired by CoStar Group in or about February 2025. On information and belief, Matterport continues to operate as a wholly owned subsidiary of CoStar Group. Matterport describes itself as a 3D spatial mapping company. On information and belief some of Matterport's customers are real estate companies that use its products to create 3D images of homes to help sell them.

6.     At all material times to this action, Defendant COSTAR GROUP (NASDAQ symbol: CSGP) was a publicly traded company headquartered in Arlington, Virginia. On information and belief, it acquired all of Matterport's assets and liabilities in a stock and cash transaction that closed on or about February 28, 2025. On its website, CoStar.com, CoStar describes itself as the only company that "delivers a comprehensive platform of commercial real estate information, analytics and data-driven news across office, industrial, retail, multifamily, hospitality and land sectors." CoStar claims to have been in business for 38 years. On information and belief CoStar maintains an office in San Francisco, California as well as offices in Los Angeles, Irvine and San Diego, California. On information and belief CoStar is jointly and severally liable for the conduct alleged herein, as a successor in interest or otherwise.

7.     MATTERPORT and COSTAR GROUP are subject to a variety of statutory schemes including, without limitation, the Sarbanes-Oxley Act of 2002 ("SOX"), the Dodd-Frank Act, the Securities Act of 1933 and the Securities Exchange Act of 1934.

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

8.     Plaintiff is informed and believes and thereon alleges that each of the Defendants herein was at all times the agent, employee, or representative of each remaining Defendant and were at all times herein acting within and outside the scope and purpose of said agency and employment. Plaintiff further alleges that as to each Defendant, whether named or referred to as a fictitious name, said Defendants supervised, ratified, controlled, acquiesced in, adopted, directed, substantially participated in, and/or approved the acts, errors, and/or omissions, of each remaining Defendant.

## **EXHAUSTION OF REMEDIES**

9.     Plaintiff timely filed complaints with federal agencies including the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), and the SEC. OSHA informed Plaintiff that more than 180 days have elapsed since filing those complaints.

10.     Plaintiff timely filed complaints with the California Civil Rights Department and received right-to-sue letters.

11.     Plaintiff has therefore exhausted her administrative remedies.

## **FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

12.     Ms. Kutagula was the only woman of color on the Matterport Executive Leadership Team ("MELT"). She was pushed out of the Company because she raised concerns about illegal activities, unethical practices, business integrity, material risks to financial data that violate SOX, discriminatory behaviors by Human Resources and sales leaders, and an overall toxic workplace. Her sales operations team was then moved from her to a white male sales leader who had a conflict of interest and a history of Sarbanes-Oxley Act violations.

13.     Ms. Kutagula led several Company initiatives, changes, and corrective actions such as new commissions structures, discount policies, incentive approval policies, and channel policies in the second half of 2023 (H2) and the first quarter of 2024 (Q1). For the majority of 2023, Ms. Kutagula was targeted by Jay Remley, Chief Revenue Officer, and Rob Hines, Senior Vice President of Sales. Despite this targeting, she continued to flag unethical business practices and business integrity issues. Ms. Kutagula partnered with the Finance Department to fix these issues.

14.     During the third quarter of 2023 (Q3), Sales closed the largest Matterport deal with negative margins. Ms. Kutagula escalated to MELT her determination that those sales had also created and rolled out their own referral incentives for the largest deal for their personal gain. Ms. Kutagula flagged this as a Sarbanes-Oxley Act (SOX) and Segregation of Duty ("SoD") violation as it created a legal and financial risk to the Company. Additionally, during Q3 2023, Mr. Remley and sales leaders manipulated another large, deeply discounted renewal contract to sign a large multi-year deal at lower levels (Y1) than the then-current consumption. This occurred despite the customer using much higher limits, leading to non-compliant contracts and provisioning. Ms. Kutagula pointed out multiple times that these needed to be corrected immediately. Ms. Kutagula expressed concern about deals like this because they compromised the Company and adherence to executed business contracts.

15.     On or about September 26, 2023, there was a meeting to discuss 2024 compensation plans. The attendees of this meeting included Ms. Kutagula, Mr. Remley, Ms. Miller, Rudy Mueller, and George Jacob. During the meeting, Mr. Remley screamed at Ms. Kutagula, exclaiming, "I will cut your salary by half and have you go door to door selling."

16.     On or about October 9, 2023, Ms. Kutagula had a meeting with Jean Barbegelata, Chief People Officer (Human Resources), during which Ms.

Kutagula reported a workplace concern. In response to Ms. Kutagula's complaint, Ms. Barbegelata laughed and said, "Oh, Jay said that!"

17.    During December 2023 and January 2024, Mr. Hines openly disparaged Ms. Kutagula multiple times and even threatened her by saying: "It is either you or me." During January 2024, Ms. Kutagula spoke about integrity issues regarding the business data with Mr. Remley and Mr. Hines. Mr. Remley was sharing inaccurate information with the CEO and CFO who were presenting the same to the Street on earnings calls, to the Board of Directors, and in all-hands meetings. Mr. Remley was upset with Ms. Kutagula because of this.

18.    From Q2 of 2023 to Q1 of 2024, Ms. Kutagula led actions with the Legal and Finance Departments of Matterport to fix non-compliant procedures. At the end of every quarter, Mr. Remley and Mr. Hines pushed for channel rebates and Market Development Funds (MDF) for resellers to accept more orders despite low customer demand for Hardware (HW), including Matterport cameras and other accessories. Mr. Remley was pushing for short-term strategies, including channel stuffing, which artificially inflated HW demand. This resulted in misrepresentations to shareholders in SEC filings, channel delinquencies, extended payment terms, and unethical sell-through practices.

19.    Ms. Kutagula pushed for channel efficiencies including channel strategy, program performance, and removal of sell-through rebates. In early March 2024, Chief Financial Officer James D. (JD) Fay flagged the fact that he instructed Mr. Remley in December 2023 not to create channel rebates anymore and, moreover, not to do so without a written agreement.

20.    Despite this, Mr. Remley continued to push for channel rebates on previously sold HW in Q1 2024. After hearing about this from Mr. Fay, Ms. Kutagula led the actions with Legal and Finance to attempt to fix the issues, including obtaining written agreements for all rebates. Ms. Kutagula was partnering with the rest of MELT to tighten up the channel programs.  Mr. Remley was upset that Ms. Kutagula partnered with Finance to fix these issues.

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

21.    In February 2024, Ms. Kutagula discovered that the Q4 2023 Net Dollar Retention (NDR) was inflated by adding Services and frontloading revenue for some of the largest deals. This was artificial inflation, as Ms. Kutagula reasonably understood it. She shared with Mr. Remley that this was not the regular NDR calculation and that the numbers appear to be artificially inflated.

22.    There were no major logos signed in Quarter 3 or Quarter 4 2023, but investors and analysts were being misled regarding new logos. As an example, new logos and NDR were misrepresented in the Quarter 4 earnings call and presentation held on or about February 20, 2024. She understood from her conversations with the Senior Director of Revenue that Mr. Remley and Mr. Hines continued to put pressure on Finance to change NDR calculations and to include Services as part of Subscription revenue for more customer accounts, and thereby artificially inflate NDR. Internally, deal sizes, new logos, and Customer Acquisition Costs (CAC) were being misrepresented to Matterport employees and to its Board of Directors. New logos used for CAC and internal/external reporting included small franchises or names from previous years.

23.    In March 2024 (unbeknown to Ms. Kutagula at that time), Matterport was actively looking to be acquired. It was doing final rounds of due diligence with CoStar Group, and all the executives were receiving additional stock/incentives during the month of March.

24.    Just three weeks before her termination by the Company, Ms. Kutagula raised concerns with CEO R.J. Pittman and Mr. Remley about NDR calculation issues and potential material risks to NDR in the second half of 2024. She also raised concerns that existing customers were being represented as new in investor presentations. She identified material financial risks and shared those with CEO R.J. Pittman and with Mr. Remley. The drastic dip in NDR for the second half of 2024 would translate to weaker 2H 2024 subscription revenue for existing customers. She told CEO Pittman on or about March 7 and March 12,

7

2024, that she had shared the early warnings back in June 2023 about the lack of new customers and the multi-year impact on NDR/revenue, and that the Company executives were manipulating metrics and misleading investors and shareholders. She also let Mr. Pittman know that Mr. Remley and Mr. Hines were putting immense pressure on Finance leader Sophia Chang to move more services revenue from other customer accounts and mark them as Subscription revenue.

25.    On or about March 12, 2024, the CEO expressed his displeasure with Mr. Remley for not having shared this information with him earlier.

26.    On or about March 19, 2024, Ms. Kutagula again reported that services and frontloaded revenue were being used to inflate Q4 NDR and that the NDR numbers were expected to come down in 2H 2024. She shared data that the excessive multi-year deals with no year-over-year revenue increase, the higher customer churn, and the artificial inflation of Quarter 4 NDR would result in a major gap to 2H 2024 NDR.

27.    Suddenly, the CEO claimed he did not want to give NDR much emphasis even though this had always been a key metric in the Company's SEC filings and investor presentations: 95% of ENT SaaS is from existing customers and has a direct impact on revenue. Ms. Kutagula disagreed with CEO Pittman when he trivialized NDR and new logos as internal metrics and claimed they would "somehow figure it out." She let him know that these are key metrics that were in their SEC filings and investor presentations and that the Company was misleading shareholders.

28.    Despite knowing the compliance issues, the CEO pushed Ms. Kutagula to compromise with Mr. Remley and Mr. Hines, and told Ms. Kutagula to stop objecting. Mr. Pittman then started attacking Ms. Kutagula, stating that he had received complaints from Christina Miller, Director of Sales Operations, that Ms. Kutagula was way too deep into the day-to-day operations.

29.    In response, Ms. Kutagula stated that the metrics, including new logos, were being falsified due to pressure from the SVP of Sales. Both Mr.

Remley and Mr. Pittman asked Ms. Kutagula to focus on Customer advocacy initiatives instead of sales operations and NDR. During a one-on-one meeting on March 19, 2024, Mr. Pittman told Ms. Kutagula to pause her focus on Sales Operations at this time and said, "August may be the season for Sales Operations," and she could resume her focus at that time.

30.    During the months of February and March 2024, Mr. Remley, Mr. Hines and Ms. Barbegelata manufactured feedback about Ms. Kutagula's direct communication style and her leadership style. They collected information from low performers on her team and from the sales organization. On information and belief, these actions were taken solely in an effort to get rid of her because she was pushing to fix unlawful policies and practices. She was frequently speaking up to push for business integrity and accountability. Ms. Kutagula received immense pressure from Mr. Remley (CRO), Mr. Pittman (CEO), and Ms. Barbagelata (CPO) to accept the feedback despite her belief that it was false. Ms. Kutagula shared factual data with them to rebut their feedback over the last two weeks of her employment.

31.    In March 2024, Ms. Kutagula shared with Mr. Remley her belief that Mr. Remley was retaliating against her with untrue feedback because she was pushing for changes that were right for the business, and because she was fixing compliance issues. As the gatekeeper for Sales Operations of a public company, Ms. Kutagula was unwilling to condone unethical and unlawful business practices.

32.    On or about March 25, 2024, Ms. Kutagula again shared with the CEO her belief that the feedback against her was manufactured and retaliatory. After this, she was immediately terminated. Mr. Remley moved Plaintiff's responsibilities for Sales Operations, Deal Desk, and Order Management to Mr. Hines, despite knowing of his prior violations of Sarbanes-Oxley Act/SoD issues.

33.    On or about February 6, 2024, Ms. Kutagula reached out to CPO Barbegelata to escalate a concern about Mr. Remley and Mr. Hines. Ms. Kutagula

9

also invited her Human Resources Business Partner (HRBP), Lauren Davis, to this meeting. Ms. Barbegelata then asked Ms. Davis not to attend a scheduled meeting for Ms. Barbegelata, Liz Scheffler, and Plaintiff. During this meeting, Ms. Kutagula shared concerns that Mr. Hines was threatening her for raising business integrity issues. She also shared instances where Mr. Hines would disparage her, other women (including his own HRBP, Ms. Davis) and minorities for raising concerns about him and his teams.

34.    Ms. Barbegelata shouted at Ms. Kutagula in front of Ms. Scheffler for complaining about Mr. Hines' misogynistic behavior. This was shocking to Ms. Kutagula. Instead of listening and addressing the complaint, she attacked Ms. Kutagula for adding her HRBP to the meeting. Ms. Kutagula left the meeting without getting her concerns about Mr. Hines addressed.

35.    A week prior to this meeting, there was an executive talent review. During this process, many others had shared similar views about Mr. Hines not putting Matterport first. However, Ms. Barbegelata still singled out Ms. Kutagula during the meeting on February 6, and asked her to retract her feedback about Mr. Hines. Ms. Kutagula followed up on this meeting via a Slack message to both Ms. Scheffler and Ms. Barbegelata. In her message, Ms. Kutagula urged them to interview others about her concerns. On information and belief, there was no investigation or follow-up regarding her concerns.

36.    On or about March 6, 2024, Ms. Kutagula had a one-on-one meeting with Mr. Remley. During this meeting, Mr. Remley shared feedback with Ms. Kutagula that six people had complained about her to HR. The number of complaints was then changed to twelve instead of the initial six. When Ms. Kutagula asked what feedback about her was given to HR, she was told that people had said she was aggressive and direct in her communication style, so others felt she was bossy.

37.    Ms. Kutagula had a long history of success in managing diverse teams over a distinguished career. This alleged negative feedback did not

represent who she was or how she led. Ms. Kutagula requested constructive feedback on where she was aggressive and how she could improve. Mr. Remley said he did not have any details and that Ms. Barbegelata was sending this information to Mr. Pittman directly.

38.     The next day, on or about March 7, 2024, Ms. Kutagula had a meeting with CEO Pittman. The CEO stated that Ms. Kutagula was the strongest MELT leader and said that she could become the Chief Operating Officer of the Company in the future. Ms. Kutagula explained the issues she had been experiencing at Matterport. She told Mr. Pittman about her workplace concerns and about the intimidation she was feeling from Ms. Barbegelata, Mr. Remley, and Mr. Hines, all of which was causing her significant emotional distress.

39.     On or about March 12, 2024, in what appeared to be an effort to cover up a pay disparity, Ms. Barbegelata gave Plaintiff a $10,000 merit increase and 454,545 restricted stock units (RSUs). She did this just two hours before they were to have a meeting with Mr. Pittman and Mr. Remley. The merit/equity letter Ms. Kutagula received stood out from the rest that Ms. Kutagula had previously received because it explicitly included language regarding at-will employment.

40.     During their meeting on or about March 12, 2024, Ms. Kutagula warned Mr. Pittman, Ms. Barbegelata, and Mr. Remley about the financial risks to NDR and revenue. During the meeting, Mr. Pittman showed that he was upset with Mr. Remley for failing to have shared this known information sooner.

41.     On or about March 25, 2024, Ms. Kutagula was out of the office on sick leave, experiencing a serious medical condition. Ms. Kutagula sent a note to Mr. Pittman telling him that she needed a day off due to a persistent headache. She requested some space as she was going through an emotional crisis. Within one hour of Ms. Kutagula's sharing a Slack message about the harassment and retaliation she experienced from both Mr. Remley and Ms. Barbegelata, and disclosing her serious medical condition, she received a termination letter.

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

42.    Ms. Kutagula was terminated five days before end-of-quarter, five days before quarterly/SOX certifications, and during the time that the Company was wrapping up due-diligence with CoStar. She had just discovered and raised concerns about investor and shareholder misrepresentations with the CEO and CRO mere days before she was fired. She had also forecasted a drop of at least 10 percentage points in 2H 2024 NDR, which had been a key metric in SEC filings since at least 2021.

43.    In February 2024, despite weaker YoY quarterly revenue for Q4 2023, Matterport reported the highest NDR in two years and record SaaS growth in its annual earnings as highlights. In its investor materials, Matterport stated, "Our net dollar expansion rate expanded to 109%, the highest level in two years, as we helped customers work faster and more efficiently to improve business productivity and reduce operational costs." It also claimed, "In 2023, we successfully expanded our portfolio of Fortune 1000 clients, welcoming notable new logos such as John Deere, Siemens, and Danone." However, these were not new logos, and no major logos signed up in 2023.

44.    On information and belief, actual and prospective investors view SaaS and NDR as key growth metrics and use these to assess their investments. When Ms. Kutagula discovered and questioned the NDR calculation and also forecasted significantly lower NDR for the second half of the year, Matterport not only abruptly terminated Ms. Kutagula but also hid this fact from the shareholders and investors.

45.    In November 2024 (eight months after terminating Ms. Kutagula), Matterport completely dropped NDR, a consistent management metric that had been part of its management discussion and analysis section since it went public in 2021, from its SEC filings without any note or explanation. In November 2024, Matterport also updated their investors as part of their Q3 10-Q that they had identified a **material weakness that existed as of December 2023**. It stated:
////

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

"Specifically, management determined we did not design and maintain appropriate controls to ensure allegations received outside of the whistleblower program are evaluated and communicated to those responsible for financial reporting and those charged with governance in a timely fashion. The material weakness was determined to have existed as of December 31, 2023, and remains unremediated as of September 30, 2024. While the Company has determined that this material weakness did not result in a misstatement to the Company's consolidated financial statements, until remediated, this material weakness could result in a misstatement of one or more accounts or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected."

46.    Plaintiff reasonably believed that Matterport's conduct, as alleged in paragraphs 11-45 above was a violation of the Sarbanes-Oxley Act. Plaintiff believed that the Company's conduct violated the Securities Exchange Act of 1934 ("the Exchange Act") and rules and regulations promulgated by the Securities and Exchange Commission, including without limitation, the books and records provisions and others found in 17 CFR Parts 230 and 240.

One of the accounting provisions, Exchange Act § 13(b), provides:

(2) Every issuer which has a class of securities registered pursuant to [15 U.S.C. § 78l] and every issuer which is required to file reports pursuant to [15 U.S.C. § 78o(d)] shall–

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer[.]

. . . .

(5) No person shall knowingly . . . falsify any book, record, or account

13

described in paragraph (2).

15 U.S.C. § 78m(b)(2)(A), (b)(5). Further, willfully falsifying books and records is a crime. See *id*. § 78ff(a).

The books-and-records provision in Exchange Act § 13(b) also has a corresponding SEC rule, 17 C.F.R. § 240.13b2–1. Titled "Falsification of accounting records," this rule provides: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2–1. This is commonly known as the "Books-and-Records Rule."

47.    Plaintiff also believed that because the Company's stock was publicly traded, additional federal statutes, rules and regulations were likely being violated, including without limitation, Rule 10b-5 and 17 CFR § 240.10b-5. Plaintiff's beliefs were reasonable under the circumstances, including based on her decades of work experience and consultations with other members of the Company's leadership.

48.    Plaintiff also reasonably believed the Company's conduct was in violation of the mail fraud and wire fraud statutes, 18 USC §§ 1341 and 1343. Plaintiff also reasonably believed the Company's conduct was in violation of the securities fraud statute found at 18 USC § 1348.

49.    As a result of Defendants' actions, Plaintiff suffered substantial losses in earnings, medical and other employment benefits, severe physical and emotional distress, attorneys' fees and other items of damage.

## **FIRST CAUSE OF ACTION**

### **(Retaliation In Violation of the Sarbanes-Oxley Act - 18 USC § 1514A)**

50.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them

by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

51. At all material times Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendants. It prohibits employers such as Matterport from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation regarding any conduct the employee reasonably believed constituted alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders, when the information or assistance is provided to or investigation is conducted by a person with supervisory authority over the employee (or another person working for the employer who has the authority to investigate), or a federal regulatory or law enforcement agency. In addition, an employer may not discharge or in any manner retaliate against an employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA") as well as bring a private action in court.

52. Plaintiff actually and reasonably believed that the actions listed above violated federal statutes, rules and regulations. Because the Company was publicly held, and because Plaintiff reasonably believed that Matterport was committing a fraud on its shareholders, and because Plaintiff reasonably believed that such fraud constituted a violation of federal fraud statutes and regulations, including without limitation, the mail fraud, wire fraud, and securities fraud

15

statutes as well as the Books and Records Rule, Plaintiff is entitled to bring her claims here.

53.     Plaintiff timely filed a whistleblower complaint with OSHA, and 180 days have elapsed since filing that complaint. No decision has been issued by OSHA, and Plaintiff has not been the cause of any delay in the issuance of a decision. Accordingly, Plaintiff is entitled to seek relief in district court by jury trial. Moreover, no pre-dispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section of SOX.

54.     Defendant harassed, threatened, retaliated against, and discharged Plaintiff, after she made oral and written complaints regarding what she reasonably believed to be illegal or unlawful conduct in violation of applicable federal statutes, rules and regulations. Plaintiff made these complaints to her employer, by and through its agents and employees, as well as to OSHA.

55.     Plaintiff is informed and believes, and thereon alleges that because of her making complaints regarding Defendants' illegal conduct and/or conduct Plaintiff reasonably believed to be illegal under SOX, Plaintiff was discharged from her employment and/or otherwise discriminated and retaliated against by Defendants after she had made the aforesaid complaints about illegal conduct.

56.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

57.     Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

58.     Defendant's actions constituted a willful violation of the above-mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel

16

Defendants to fully perform their obligations under state and federal law, in amounts according to proof at time of trial.

59.     The conduct of Defendants described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

60.     Defendants committed the acts alleged hereinabove by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies and damages allowable by law.

61.     As a proximate result of the actions and conduct described hereinabove, which constitute violations of Section 806 of the Sarbanes-Oxley Act of 2002, Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks make-whole relief, civil penalties and attorneys' fees against Defendants pursuant to SOX.

62.     Wherefore Plaintiff prays for relief as stated in pertinent part hereinafter.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Labor Code § 1102.5)

63.     As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

64.     At all times material to this Complaint, California Labor Code § 1102.5 was in effect and binding on Defendants. This section requires Defendants

to refrain from retaliating against an employee for, among other things, reporting suspected legal violations to government or law enforcement agencies, or to individuals within the Company who have the authority to address the issue.

65.    Plaintiff had a reasonable belief that Defendants were violating state and federal laws, including the laws described hereinabove, California's own securities laws and the California Fair Employment and Housing Act, and reported those violations to Defendants' senior management including Matterport's CEO.

66.    Defendants retaliated against Plaintiff for her whistleblowing, by harassing, threatening, and terminating her, among other things, all in violation of Labor Code § 1102.5.

67.    As a direct and proximate result of such retaliation, Plaintiff has been damaged in a sum according to proof.

68.    Plaintiff requests all available relief under Labor Code § 1102.5 including damages and the imposition of a civil penalty of $10,000.00 for each violation, together with attorneys' fees pursuant to Labor Code § 1102.5(j).

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of Government Code § 12940)

69.    As a separate and distinct cause of action, Plaintiff complains and realleges all the allegations contained in this Complaint and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

70.    At all times relevant to this Complaint, Defendants were subject to the provisions of the Fair Employment and Housing Act ("FEHA"), and in particular, Government Code § 12940. This section prohibits Defendants from discriminating against any employee or other covered person on the basis of gender, age, ethnicity, national origin, ancestry, or mental or physical disability, among other things.

71.     Plaintiff is a woman over age 40 of South Asian ancestry and national origin. Plaintiff became temporarily totally disabled just prior to her termination, as Defendants well knew. Plaintiff is a member of a protected class within the meaning of the aforesaid Government Code section. Ms. Kutagula alleges that her gender, age, ethnicity, national origin, ancestry, and/or mental or physical disability were factors in Defendants' actions as alleged above, including her termination. Such discrimination is in violation of Government Code § 12940 and has resulted in injury to Plaintiff.

72.     As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer loss of reputation, goodwill, and standing in the profession in which Plaintiff has worked, thus precluding or diminishing Plaintiff's opportunity of employment in the profession, all to Plaintiff's damage in an amount to be proven at time of trial.

73.     As a proximate result of Defendants' willful and knowing discrimination against Plaintiff, Plaintiff has suffered and continue to suffer losses in earnings, benefits and other consequential damage in amounts according to proof.

74.     Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

75.     In bringing this action, Plaintiff has been required to retain the services of legal counsel. Pursuant to California Government Code § 12965(b), she is entitled to an award of reasonable attorneys' fees including a multiplier as permitted by law.

## FOURTH CAUSE OF ACTION
### (Hostile Work Environment Harassment (Cal. Gov't Code § 12940(j))

76.     As a separate and distinct cause of action, Plaintiff complains and

realleges all the allegations contained in this Complaint against all Defendants, and incorporate them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

77.    Pursuant to Government Code § 12940(j), it is unlawful for any designated person or employer to harass an employee on the basis of on the basis of gender, age, ethnicity, national origin, ancestry, or mental or physical disability, among other things.

78.    Defendants have created and tolerated the existence of a hostile work environment for Plaintiff on the bases alleged in the preceding paragraph.

79.    Defendants' conduct would seriously affect the emotional well-being of any reasonable employee or other protected person and did in fact interfere with Plaintiff's emotional well-being and create such psychological harm.

80.    Defendants' conduct would, and did interfere with, Plaintiff's work performance such that it altered the nature of their employment and/or other relationships with Defendants.

81.    As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer substantial losses in earnings and other benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code § 3287 and any other provision of law providing for prejudgment interest.

82.    As a further direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, embarrassment, depression, and mental pain and anguish, all to Plaintiff' damage in an amount to be proven at time of trial.

83.    As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff have suffered and will continue to suffer loss of reputation, goodwill, and standing in the industry in which Plaintiff has worked,

thus precluding or diminishing Plaintiff' opportunities of employment in the industries in which she has worked, all to Plaintiff' damage in an amount to be proven at time of trial. In bringing this action, Plaintiff has been required to retain the services of legal counsel. Pursuant to California Government Code § 12965(b), Plaintiff is entitled to an award of reasonable attorneys' fees including a multiplier as permitted by law.

84.    Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

85.    Plaintiff requests all available relief under the Government Code and the Code of Civil Procedure, including but not limited to reasonable attorney's fees and costs.

86.    As a proximate result of Defendants' willful, knowing and malicious harassment against Plaintiff, Plaintiff has suffered and continues to suffer losses in earnings, benefits and other consequential damage in amounts according to proof.

## FIFTH CAUSE OF ACTION

### (Retaliation – Violation of Cal. Gov't Code § 12940(h))

87.    As a separate and distinct cause of action, Plaintiff complains and realleges all the allegations contained in this Complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

88.    Government Code § 12940, *et seq.* prohibits employers from retaliating against a person who makes a complaint of harassment, discrimination or retaliation and/or assists another person who makes a complaint of harassment or discrimination.

89.    Defendants retaliated against Plaintiff because of her complaints regarding disparate treatment as alleged hereinabove.

90.    Defendants failed and refused to conduct an adequate investigation into these complaints, and knowingly sought to retaliate against and punish Plaintiff in violation of state law, including Government Code § 12940(h).

91.    Defendants knew or should have known that the consequences of their unlawful conduct would cause injury to Plaintiff, including emotional and mental harm, but Defendants nonetheless persisted in such conduct.

92.    Defendants' conduct would seriously affect the emotional well-being of any reasonable employee or protected person, and did in fact interfere with and create such psychological harm in Plaintiff.

93.    Defendants' conduct would, and did interfere with, Plaintiff' work performance such that it altered the nature of her work and employment.

94.    Within the time provided by law, Plaintiff filed complaints with the California Civil Rights Department, in full compliance with these sections and received right-to-sue letters.

95.    As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer substantial losses in earnings and other benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to Civil Code § 3287 and any other provision of law providing for prejudgment interest.

96.    As a further direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, embarrassment, depression, and mental pain and anguish, all to Plaintiff's damage in an amount to be proven at time of trial.

97.    As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer loss of reputation, goodwill, and standing in the industries in which Plaintiff has worked, thus precluding or diminishing Plaintiff's opportunities of employment in the

industries in which she has worked, all to Plaintiff's damage in an amount to be proven at time of trial. In bringing this action, Plaintiff has been required to retain the services of legal counsel. Pursuant to California Government Code § 12965(b) and other statutes, Plaintiff is entitled to an award of reasonable attorneys' fees including a multiplier as permitted by law.

98.    Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Failure to Take Reasonable Steps to Prevent– Violation of Cal. Gov't Code § 12940(k))

99.    As a separate and distinct cause of action, Plaintiff complains and realleges all the allegations contained in this Complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

100.    At all times mentioned in this complaint, Government Code § 12940(k) was in full force and effect and was binding on Defendants. This subsection requires Defendants to take all reasonable steps necessary to prevent discrimination, retaliation and harassment from occurring. As alleged above, Defendants violated this subsection by failing to take all reasonable steps necessary to prevent discrimination, retaliation and harassment from occurring.

101.    Within the time provided by law, Plaintiff filed complaints with the California Civil Rights Department, in full compliance with these sections and have received right-to-sue letters.

102.    As a proximate result of Defendants' failure to prevent discrimination, harassment and retaliation against Plaintiff, Plaintiff have suffered and continue to experience substantial losses in earnings, benefits and other consequential damages in amounts according to proof.

103.    Pursuant to Government Code § 12965(b), Plaintiff seeks recovery of their attorneys' fees and costs against Defendants, and each of them.

## SEVENTH CAUSE OF ACTION

### (Violation of California Family Rights Act (Government Code § 12945.2))

104.    As a separate and distinct cause of action, Plaintiff complains and realleges all the allegations contained in this Complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

105.    At all times mentioned in this complaint, Government Code § 12945.2 was in full effect and binding on Defendants. This law permits eligible employees to take protected medical leave, and prevents Defendants from interfering with or refusing to grant such leave to eligible employees, or retaliating against employees for doing so, among other things.

106.    Plaintiff was an eligible employee under CFRA.

107.    On or about March 25, 2024, and prior, Plaintiff informed Defendants of her serious health condition that required her to take medical leave. Instead of granting her the leave to which she was entitled, Defendants terminated her immediately.

108.    Plaintiff alleges that Defendants retaliated against her for taking or seeking to take CFRA leave, and that her taking or seeking to take protected CFRA leave was a factor in Defendants' actions as alleged above in retaliating against her, including terminating her, all in violation of Government Code § 12945.2, and has resulted in injury to her.

109.    As a direct, foreseeable, and proximate result of these wrongful acts by Defendants, Plaintiff has suffered and will continue to suffer loss of reputation, goodwill, and standing in the profession in which she has worked, thus precluding or diminishing Plaintiff's opportunity of employment in here profession, all to Plaintiff's damage in an amount to be proven at time of trial.

110.   As a proximate result of Defendants' willful and knowing discrimination against Plaintiff, she has suffered and continues to suffer losses in earnings, benefits and other consequential damage in amounts according to proof.

111.   In bringing this action, Plaintiff has been required to retain the services of legal counsel. Pursuant to California Government Code § 12965(b), she is entitled to an award of reasonable attorneys' fees including a multiplier as permitted by law.

## EIGHTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

112.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

113.   At all times material hereto, Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendants. This law prohibits employers such as Defendants from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided reported information or caused information to be provided to her employer, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.

114.   At all times mentioned in this complaint, California Labor Code

Section 1102.5 was in full force and effect and was binding on Defendants. This law requires Defendants to refrain, among other things, from retaliating against employees who refuse to participate in or condone conduct they reasonably believe to violate state or federal law.

115.  Title 18 USC § 1343 defines the crime of wire fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money.... by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

116.  Title 18 USC § 1341 defines the crime of mail fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money.... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, r deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

117.  California Business & Professions Code § 17200 provides that unfair competition shall mean any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Section 17500, *et seq.*, of the Business & Professions Code. Section 17203 of the Business & Professions Code provides that a court of competent jurisdiction may enjoin any conduct constituting unfair competition under § 17200.

118.  Each of the aforesaid laws is a fundamental policy of the State of California.

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

119. Plaintiff believes and thereon alleges that her whistleblowing, refusing to condone illegal activity, and engaging in protected activity, was or were a motivating factor in Defendants' conduct as alleged hereinabove, including terminating Plaintiff.

120. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; and Plaintiff has suffered and continued to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

121. Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## NINTH CAUSE OF ACTION

### (Unfair Business Practices - Bus. & Prof. Code § 17200 *et seq.*)

122. As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

123. Defendants' conduct as alleged above violates multiple state and federal laws and constitutes unlawful business practices within the meaning of California Business & Professions Code § 17200, *et seq.*

124. Plaintiff is informed and believes and thereon alleges that Defendants continue to engage in some or all of the aforementioned unfair and unlawful business practices.

125. Plaintiff seeks an injunction prohibiting Defendant from engaging in the unfair and unlawful conduct described herein. Plaintiff also seeks attorneys'

27

fees pursuant to the private attorney general doctrine, as codified in California Civil Code § 1021.5.

## TENTH CAUSE OF ACTION

### (Declaratory Relief)

126.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

127.   A dispute and an actual controversy has arisen between the parties regarding the enforceability of a document purporting to compel Plaintiff to arbitrate certain claims against Defendants.

128.   Plaintiff asserts that under SOX, *Armendariz v. Foundation HealthCare* (2000) 24 Cal.4th 83 and its progeny, and the public policies of California and the United States, the arbitration document is unenforceable for a number of reasons as set forth in statutes and the case law. On information and belief Defendant asserts that the document is enforceable and that Plaintiff must bring her claims in arbitration.

129.   Plaintiff desires a judicial determination of the parties' rights and obligations of the parties with respect to the document, and a declaration that the arbitration document is invalid because it lacks mutuality, is procedurally and substantively unconscionable, and violates public policy.

130.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain her rights and duties under the alleged arbitration agreement, and not be forced to forgo her constitutional right to a trial by jury.

131.   Plaintiff does not seek to avoid the alleged agreement to arbitrate unless the alleged arbitration agreement is declared invalid and/or unenforceable.

# **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.     For compensatory damages, including lost wages, medical benefits and other employment benefits, according to proof;

2.     For back pay with interest;

3.     For general, mental and emotional distress damages according to proof;

4.     For punitive damages on each cause of action for which they are awardable;

5.     For all civil penalties awardable;

6.     For an award of interest, including prejudgment interest, at the legal rate;

7.     For an award of litigation costs and attorneys' fees as awardable on each cause of action pursuant to SOX, Labor Code Section 1102.5(j), Government Code § 12940 *et seq.*, the private attorney general doctrine, as codified in California Civil Code Section 1021.5, and any other available bases;

8.     For an injunction ordering Defendants to cease and desist their unlawful practices;

9.     For costs of suit incurred;

10.     For a declaratory judgment that the alleged arbitration agreement is

////
////
////
////
////
////
////
////
////

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF

invalid because it lacks mutuality, is unconscionable, violates public policy and is prohibited under SOX and/or other applicable statutes; and

9.     For such other and further relief as the court deems just and proper.

DATED: June 26, 2025          THE GILLAM LAW FIRM
                              *A Professional Law Corporation*

                              *s/CAROL GILLAM*
                              Carol L. Gillam
                              Attorneys for Plaintiff Vinatha Kutagula


## **DEMAND FOR JURY TRIAL**

Plaintiff Vinatha Kutagula hereby demands a jury trial on all issues so triable.

DATED: June 26, 2025          THE GILLAM LAW FIRM
                              *A Professional Law Corporation*

                              *s/CAROL GILLAM*
                              Carol L. Gillam
                              Attorneys for Plaintiff Vinatha Kutagula

PLAINTIFF VINATHA KUTAGULA'S COMPLAINT FOR
DAMAGES AND OTHER RELIEF